**AFFIRMED and Opinion Filed February 4, 2022**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-19-01436-CR**

**SHAWN RYAN BLANKINSHIP, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 1**
**Rockwall County, Texas**
**Trial Court Cause No. CR17-0584**

## MEMORANDUM OPINION

Before Justices Osborne, Reichek, and Smith
Opinion by Justice Reichek

A jury convicted Shawn Ryan Blankinship of unlawfully carrying a weapon, and the trial court assessed his punishment at two days in the county jail. In three issues, appellant argues the trial court erred in denying his motion to suppress evidence obtained from an allegedly illegal traffic stop. For reasons set out below, we overrule all issues and affirm.

### FACTUAL BACKGROUND

At the time of the October 2019 trial, Christopher Cooper was a detective with the Rockwall County Sheriff's Office. On the day of the stop, however, Cooper was a deputy-in-training who was near the end of his eighteen-month training period.

Cooper testified that on the afternoon of March 2, 2017, he was on patrol with his supervising officer when they stopped a vehicle driven by appellant for "unconfirmed insurance, no match within 45 days on the vehicle." Cooper explained that he ran appellant's license plate number on the in-car computer or mobile data terminal (MDT), and it showed there was no insurance associated with the vehicle. Cooper said it was a check he regularly ran and had found it to be reliable.

Testimony and body-cam video showed Cooper approached the vehicle, which was occupied by appellant, his wife, and their two-year-old child. Cooper asked appellant for his driver's license and proof of insurance. Appellant asked if he "did something wrong," and Cooper told him he stopped him because he ran his "tag," and it showed "no insurance on the vehicle." Appellant responded that he was trying to "get that straightened out right now." Appellant gave Cooper his Texas identification card and said his driver's license had been suspended because of "points." Cooper asked appellant's wife for her ID, and she gave it to him.

Cooper returned to his patrol unit to do a "records checks" and learned that appellant had warrants out of multiple jurisdictions. Cooper then returned to appellant and asked him to step out of his vehicle. He asked if appellant had any weapons on him, and appellant said he had a knife. Cooper took the knife and then patted him down. Cooper told appellant he had warrants "out of everywhere," and appellant responded that he had "been trying all day long to figure that out." Cooper

replied that he "understood" and "believed" appellant and was "not taking him to jail on them." But, Cooper said, there was not "just one" warrant, there were multiple warrants out of multiple jurisdictions. Appellant asked if Cooper could give him information on the warrants, and Cooper said he'd have to "look further into it" and could tell him the cities that issued the warrants but not the charges. Cooper then asked appellant how he knew the passengers and where they were coming from, and appellant answered those questions. He then told appellant to "hang tight."

Cooper walked to the passenger side of the vehicle and asked appellant's wife, Tiffany Flores, if she "[would] mind coming to talk" to him "real quick." Flores stepped outside the car, and Cooper asked if she had any "knives, guns, weapons" on her, and she said she did not. He then asked Flores where they were coming from, how she knew appellant, and if she had ever been arrested. When he asked if there was anything illegal in the car, "like knives, guns, drugs, or bombs, anything like that," Flores responded that there was a gun registered to her in the center console. She told Cooper he could "check it out" if he wanted, and he said he would first get consent from the driver. Cooper asked Flores if she could remove the child from the car so he could "grab" the weapon, which she did. Cooper asked what kind of firearm was in the vehicle and the brand. After she told him, Cooper told Flores that appellant had multiple warrants out of multiple agencies, but he was "cutting him a

3

break" and not taking him to jail "on it," but he was going to ask his consent to retrieve the gun and "just check it out."

When he returned to appellant, Cooper asked about the gun, and appellant said it was his. Cooper asked if there was anything illegal in the car, "guns, knives, drugs, dead bodies," and appellant said there was "pot" inside the vehicle in the top visor. Cooper said he "appreciate[d] [appellant's] honesty" and said he would look into the warrants "in a second," but he was going to search the vehicle since appellant had said there were drugs in there and "grab that firearm, if that's okay." During the search, Cooper found a marijuana pipe in the driver's side door panel and a handgun in the center console. Although he did not find any drugs in the visor, he did find a tin containing marijuana in the center console. At that point, which was nineteen minutes after the initial stop, Cooper arrested appellant. He was ultimately charged with possession of marijuana, unlawfully carrying a weapon, and possession of drug paraphernalia.

At trial, appellant orally moved to suppress evidence found as a result of the stop, arguing officers had no reason to stop him and no reason to further detain him once Cooper confirmed the outstanding warrants but told him he was not going to arrest him. The trial court denied appellant's motion. The jury ultimately convicted appellant of the weapons charge. This appeal ensued.

### MOTION TO SUPPRESS

4

## 1. Standard of Review

When reviewing a trial court's decision on a motion to suppress, we give almost total deference to the court's determination of historical facts but review de novo its application of law to the facts. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). When the trial court does not make explicit findings of historical fact, as here, we view the evidence in the light most favorable to the court's ruling and assume the court made implicit findings of fact supported by the record. *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex. Crim. App. 2000). The trial court is the sole judge of the credibility of the witnesses and their testimony. *Maxwell*, 73 S.W.3d at 281.

## 2. Reasonable Suspicion for Stop

In his first issue, appellant argues that Cooper did not have reasonable suspicion to conduct a traffic stop based solely on unconfirmed insurance, relying on our sister court's opinion in *Contraras v. State*, 309 S.W.3d 168, 172 (Tex. App.—Amarillo 2010, pet. ref'd) (mem. op.). He contends that "unconfirmed insurance stops" are problematic because "there is no actual proof that the vehicle is uninsured" and the database systems "can be unreliable" and are dependent upon other systems, such as the insurance companies' databases, which can also be unreliable.

Within his issue, appellant does not analyze the particular facts of this case within the context of *Contraras* or any other case. Thus, we question whether appellant has preserved this issue for our review. Even if we were inclined to conclude he has, we are unpersuaded by his argument.

In the context of a traffic stop, police officers are justified in stopping a vehicle when the officers have a reasonable suspicion to believe that a traffic violation has occurred. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). Under the Fourth Amendment, reasonable suspicion exists when the officer has specific, articulable facts that, combined with rational inferences from those facts, lead him to reasonably suspect that that the person detained actually is, has been, or soon will be engaged in criminal activity. *Brodnex v. State*, 485 S.W.3d 432, 437 (Tex. Crim. App. 2016); *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). This is an objective standard that disregards the subjective intent of the officer and requires only some minimal level of justification for the stop. *Brodnex*, 485 S.W.3d at 437. However, the officer must have more than an inarticulable hunch or mere good-faith suspicion that a crime was in progress. *Id*. Reasonable suspicion is a lower level of suspicion than probable cause, and probable cause "falls far short of a preponderance of the evidence standard." *Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009).

6

Drivers in Texas must maintain proof of financial responsibility for their vehicles. TEX. TRANSP. CODE ANN. § 601.051 (West 2011). Operating a vehicle for which financial responsibility has not been established is a misdemeanor punished by a fine. *See id.* § 601.191.

Generally, an officer may use information obtained from checking a vehicle's license plate in a computer database to form reasonable suspicion. *Villarreal v. State*, 631 S.W.3d 198, 203 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (officer's testimony showing reliability of databases and his experience with them sufficient to show reasonable suspicion that vehicle was unregistered based on "no record" return); *see Delk v. State*, 855 S.W.2d 700, 709–10, 712 (Tex. Crim. App. 1993) (concluding officers had reasonable suspicion to question defendant after officer "ran a license check on a vehicle" in law enforcement database, and computer indicated car had been stolen and owner was homicide victim). This includes traffic stops based on an officer's database-derived suspicion that the driver may be operating the vehicle without insurance. *See e.g., Ellis v. State*, 535 S.W.3d 209, 214 (Tex. App.—Fort Worth 2017, pet. ref'd); *United States v. Broca-Martinez*, 855 F.3d 675, 679–80 (5th Cir. 2017) (concluding "state computer database indication of insurance status may establish reasonable suspicion" after reviewing state and federal decisions).

In *Ellis*, the court explained that the cases involving these types of stops fall into two categories: (1) where courts have held an officer did not have reasonable suspicion where the evidence was not developed to determine the ambiguous answer's meaning or reliability and (2) where courts have held that reasonable suspicion existed when the officer, through experience or training, had additional information about what the ambiguous answer from the database meant and "some idea" regarding the data's reliability." 535 S.W.3d at 214.

Here, appellant relies on *Contraras*, a case that belongs in the first category, to support his argument that an "unconfirmed" report, standing alone, does not support reasonable suspicion. In *Contraras*, two Department of Public Safety troopers were on patrol on a highway known as a main route for drug trafficking when they observed Contraras's vehicle pass them in the opposite direction and decided to turn around and follow it. *See Contraras*, 309 S.W.3d at 169. The troopers checked their in-vehicle computer, and the database gave them information that the vehicle's registration was current but that the insurance information was either "unavailable" or "undocumented." Based on this information, they initiated a traffic stop and ultimately discovered drugs. *Id*. at 170. The trial court denied Contraras's motion to suppress.

On appeal, the court rejected the State's argument that the officers had reasonable suspicion that the driver was driving without insurance. As the court

8

explained, the record provided no explanation of the meaning of the terms "unavailable" or "undocumented" and, in this context, the terms were not self-explanatory. *See id*. at 172–73. Further, the court noted that in a companion case, *Gonzalez-Gilando*, one of the troopers agreed the response he received indicated "they could have insurance or they may not have insurance." *Id*. at 173; *Gonzalez-Gilando v. State*, 306 S.W.3d 893, 896 (Tex. App.—Amarillo 2010, pet. ref'd). The court declined to speculate on the meaning of "unavailable" and "undocumented" in the particular context of the database, and concluded the officers did not have reasonable suspicion to believe Contraras was operating a motor vehicle without valid liability insurance. *Contraras*, 309 S.W.3d at 173. The Amarillo court reached the same conclusion in *Gonzalez-Gilando*, where the court reasoned that the information obtained by the officers was "hardly suggestive of anything other than the unknown." 306 S.W.3d at 896.

But in this case, Cooper did not testify that the return showed "unavailable" or "undocumented." Rather, Cooper testified the MDT returned information on the vehicle showing "unconfirmed insurance, no match within 45 days on the vehicle." Cooper testified that meant it "showed no insurance" and, more specifically, "no vehicle coverage within 45 days." Thus, contrary to *Contraras* and *Gonzalez-Gilando*, where the record did not explain the meaning of the database response, Cooper's testimony was not ambiguous or inconclusive or "as likely to support a

9

finding of compliance as it was for violation." *See Crawford v. State*, 355 S.W.3d 193, 198 (Tex. App.—Houston [1st Dist.] 2011, pet ref'd).  And nothing in either *Contraras* or *Gonzalez-Gilando* suggests that information that insurance is "unconfirmed" is insufficient to support reasonable suspicion.  Moreover, Cooper testified that he used the database regularly and it had been reliable, although he acknowledged on cross-examination, that the database had been wrong "at times."

Given the record before us, we conclude the State developed evidence demonstrating that Cooper had specific, articulable facts upon which he could reasonably conclude that appellant's vehicle was not insured.  Further, this conclusion is consistent with a number of other cases which have reached the same result when officers explained the meaning of "unconfirmed" and testified, based on their experience, that the system was reliable; testified about detailed information on the insurance policy as provided by the MDT response; or both.  *See Ellis*, 535 S.W.3d at 211 (officer explained meaning of "unconfirmed" return and had used database "[t]ens of thousands" of times, which was "enough experience to know that except for "a handful" of the "[h]undreds, if not thousands" of times he had received an "unconfirmed" return from the database, the return meant that the vehicle . . . was not currently insured"); *Crawford v. State*, 355 S.W.3d 193, 195, 198 (Tex. App.— Houston [1st Dist.] 2011, pet. ref'd) (concluding specific information yielded by database sufficient to support reasonable suspicion finding where officer testified

10

MDT response identified the insurance company that issued last policy covering vehicle, gave policy number, and showed policy had expired more than forty-five days earlier); *Morning v. State*, No. 10-18-00051-CR, 2018 WL 5662228, at *3 (Tex. App.—Waco Oct. 31, 2018, no pet.) (mem. op) (officer explained meaning of "unconfirmed status" and testified he regularly conducted license-plate checks during three-and-a-half years as peace officer and, in his experience, believed database was "very accurate and reliable); *Oliva-Arita v. State*, No. 01-15-00140-CR, 2015 WL 7300202, at *1 (Tex. App.—Houston [1st Dist.] Nov. 19, 2015, no pet.) (mem. op.) (officer explained meaning of "unconfirmed" return, said he used database " a lot . . . for almost every traffic stop," and, in his experience, information received was "reliable," although he occasionally stopped vehicles whose insurance showed "unconfirmed" but were actually insured" and estimated 75% of vehicles stopped with "unconfirmed" insurance had no insurance).  We overrule the first issue.

## 2.  Prolonged Detention

In his second and third issues, appellant argues that Cooper "had no reason to extend the scope of the stop" after telling him he was not going to arrest him on outstanding warrants.  He argues that the purpose of the stop ended at that point, Cooper's questioning was beyond the scope of the original justification for the stop, and anything obtained by that questioning is "fruit of the poisonous tree."

During a traffic stop, the officer may request certain information from a driver, such as the driver's license, vehicle registration, and proof of insurance, and run a computer check on that information. *Lerma*, 543 S.W.3d at 190. An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop. *Id*. A detention becomes unreasonable only if an officer unduly prolongs the detention after the original reason for the detention is resolved. *Kothe v. State*, 152 S.W.3d 54, 65–67 (Tex. Crim. App. 2004).

There is no per se rule on when the officer must perform the computer check on the information gathered from the driver. *Lerma*, 543 S.W.3d at 190–91. Once that computer check is completed, and the officer has confirmed that the driver has a valid license, no outstanding warrants, and the car is not stolen, the traffic investigation is complete. *Id*. at 191. But, if the officer has developed reasonable suspicion that the driver is involved in criminal activity, the officer may continue questioning the driver regardless of whether the traffic investigation has been completed. *Id*.

In this case, rather than showing no outstanding warrants, the computer check showed appellant had multiple outstanding warrants for his arrest from various agencies. Moreover, Cooper had developed facts that showed appellant also did not have a valid driver's license and was driving without insurance. Thus, even if we

12

assume that the outstanding warrants were not enough to continue the traffic investigation, given Cooper's statement that he was not going to arrest appellant for them, Cooper had not indicated how he was going to resolve the driver's license and insurance issues. *See Lerma*, 543 S.W.3d at 194; *Fisher v. State*, 481 S.W.3d 403, 410 (Tex. App.—Texarkana 2015, pet. ref'd) (issuing citation or warning is related to original public safety purpose for traffic stop). Six minutes elapsed from the time Cooper advised appellant of the warrants and he learned there was a gun and marijuana in the car. During that time, Cooper and appellant had a discussion about warrants and then Cooper continued with his investigation, asking appellant standard questions about the identity of his passengers and where they were coming from. *See Kothe*, 152 S.W.3d at 63–64 & n.36 (describing actions police officer is authorized to do during traffic stop, including questioning driver regarding travel plans). From there, he told appellant to "hang tight" while he spoke to Flores. *See Lerma*, 543 S.W.3d at 190 (officer allowed to ask passengers about matters unrelated to stop, so long as questioning does not measurably extend duration of stop). He asked her similar questions and, when asked if there was anything illegal in the car, she told him there was a gun, it belonged to her, and it was registered. Cooper asked appellant for permission to retrieve the gun, and appellant told him it was his and, in response to Cooper's question as to whether there was anything illegal in the vehicle, said there was marijuana. Neither interaction unreasonably extended the traffic stop

13

nor is there anything to suggest Cooper's actions were inconsistent with the traffic stop's purpose. He did not deliberately delay questioning of appellant or Flores as a pretext to a "fishing expedition;" rather, the record shows that Cooper first performed the records check and then immediately talked to both appellant and Flores. Under these circumstances, we conclude appellant was not illegally detained when Cooper developed probable cause to search the vehicle. We overrule issues two and three.

We affirm the trial court's judgment.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
191436F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

SHAWN RYAN BLANKINSHIP,
Appellant

No. 05-19-01436-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at
Law No. 1, Rockwall County, Texas
Trial Court Cause No. CR17-0584.
Opinion delivered by Justice
Reichek; Justices Osborne and Smith
participating.

Based on the Court's opinion of this date, the judgment nunc pro tunc of the trial court is **AFFIRMED**.

Judgment entered February 4, 2022

15